IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 2, 2010

## JOHN BRITT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-03257      W. Mark Ward, Judge**

**No. W2009-02422-CCA-R3-PC  - Filed June 27, 2011**

The petitioner, John Britt, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief.  Following a jury trial, the petitioner was convicted of two counts of solicitation to commit first degree murder and is currently serving consecutive eight-year sentences.  On appeal, the petitioner contends that he was denied his Sixth Amendment right to the effective assistance of counsel, specifically arguing that trial counsel was ineffective for failing to use the entrapment defense at trial.  Following review of the record, we conclude no error exists and affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, John Britt.

Robert E. Cooper, Jr., Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Thomas Hoover, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Procedural History

The petitioner in this case was convicted of soliciting another person to kill his ex-wife and her mother.  The relevant facts underlying the convictions, as recited on direct appeal, are as follows:

The evidence presented at trial shows that the [petitioner] solicited a

former employee and acquaintance, Jan Welch, to kill his ex-wife and her mother. The [petitioner's] ex-wife, Laurie Britt, testified that she and the [petitioner] were married for fourteen years and had three children. She stated that they were divorced in May 2003. She further related that she filed for divorce in October 2001 when she was pregnant with their third child after learning that the [petitioner] was having an extramarital affair. She recalled that they reconciled for a period of time in February 2002, but that she discovered the [petitioner] "with the other woman and decided then it was time for me to just move on because he hadn't really truly sincerely changed his behavior and his patterns." She stated that although a divorce was granted in December 2002, the [petitioner] contested the divorce and it was not actually final until May 2003. She recalled that the day the initial order was set aside on January 10, 2003, she and the children returned home from church to find their [thirty-one-foot] recreational vehicle gone. At the time the RV was taken, the [petitioner] was supposedly living in North Carolina with family. Ms. Britt testified that the [petitioner] told her that he had someone take the RV. In February 2003, officers from the Bartlett Police Department came to her home to discuss the [petitioner] with her and told her that "it concerned [her] safety." When asked about her relationship with the [petitioner] during this time period, Ms. Britt replied:

> Well, he was definitely very very upset that I went forward with the divorce. And our conversations were very limited because he was so angry and so mad that I had moved forward and gone ahead with the divorce that we could not have a conversation without him yelling or screaming or using profanity and calling me names. So I pretty much would just say this is the end of the conversation and goodbye.

Ms. Britt also testified that there had been issues regarding the [petitioner's] visitation with the children brought on by the [petitioner's] destructive behavior. Specifically, she stated that on December 23, 2002, the [petitioner] destroyed several of their vehicles by ramming them into a telephone pole, arrived at her home in a drunken rage and, when asked to leave, destroyed the mailbox upon his departure. Despite this violent behavior, February 20, 2003 was the first she learned that the [petitioner] was trying to have her killed.

On cross-examination, Ms. Britt denied ever interfering with the [petitioner's] visitation with the children but acknowledged that the court had

[ordered] supervised visitation at his attorney's office at the time the [petitioner] was arrested. She also admitted that she was contacted by Phil Devers, the [petitioner's] paramour's husband, on December 26, 2002 and confirmed to him that their spouses were having an affair.

. . . .

Bartlett Police Department Detective J.J. Leatherwood testified that he was called to the station to investigate a murder for hire allegation made by Jan Welch. After Welch arrived and made the complaint, Detective Leatherwood went to Ms. Britt's home to tell her about the allegation. During the course of the investigation, detectives equipped Welch's telephone with a recording device to record any phone calls from the [petitioner]. After not receiving any phone calls from the [petitioner] for several days, the detectives had Welch telephone the [petitioner] on February 26. Based upon what transpired in his telephone conversation with the [petitioner], detectives arranged a meeting between Welch and the [petitioner] for February 28. On February 28, Welch came to the Bartlett Police Department where detectives placed a body wire on him in preparation for his meeting with the [petitioner]. Through the surveillance, detectives recorded the conversations between Welch and the [petitioner]. The surveillance eventually culminated in the [petitioner] arranging to meet Welch at a bank in order to pay Welch an amount of money in exchange for the murder of Ms. Britt and her mother. Detectives arrested the [petitioner] as he exited the bank. At the station, detectives advised the [petitioner] of his *Miranda* rights and questioned him. The questioning ceased when the [petitioner] requested an attorney. Detectives videotaped the statement.

On cross-examination, Detective Leatherwood acknowledged that Phil Devers was an officer with the Bartlett Police Department but denied that Officer Devers had any involvement in the investigation of the case. He also acknowledged that Welch was instructed to meet the [petitioner] and "recap" their previous conversations about the murders for hire.

Jan Welch testified that the [petitioner] was his boss when he worked as a security officer for Memphis City Schools. He also indicated that the [petitioner] had dated his sister, Kim Devers. He described his relationship with the [petitioner] as "[m]ostly business," stating that he often did "odd jobs" for the [petitioner]. He testified that he "repossessed" an RV for the [petitioner] from Ms. Britt's home and drove it to Knoxville for the [petitioner]. He recalled that the [petitioner] and Kim Devers paid him six hundred and fifty

dollars for "repossessing" the RV.

Welch stated that in February 2003, the [petitioner] telephoned him and asked him if he "could pull another job for him." At that time, the [petitioner] asked Welch "if [he] could find somebody to have his wife Laurie Britt done in." Initially, Welch did not take the [petitioner] seriously, but after the [petitioner] called back and told Welch that he could come up with the money for the down payment, Welch reported the telephone call to Officer Phil Devers at the Bartlett Police Department, his ex-brother-in-law at the time of the trial. Welch recalled that he went to Officer Devers' home and talked to a lieutenant in the department before going to the police station to discuss the incident with the detectives. Welch testified that several of his conversations with the [petitioner] were tape recorded during the course of the investigation and that, during one conversation, the [petitioner] indicated that he wanted two people killed. Welch told the [petitioner] that he knew someone that would do it, but he testified that he made that up as part of the investigation. When Welch and the [petitioner] met to get the down payment, the [petitioner] told Welch that he wanted Ms. Britt and her mother killed. They traveled to two banks to obtain the five thousand dollar down payment. Upon leaving the last bank, detectives arrested the [petitioner]. Welch testified that he had never been involved in a police investigation before. He stated that he wanted to help the police catch the [petitioner] because of the [petitioner's] relationship with his sister and that he "felt like if [the [petitioner]] would do this to the mother of his own children . . . who's to say he would not do it to my sister later on in life."

On cross-examination, Welch testified that he resigned from the security job because he tested positive for marijuana. He denied that the [petitioner] fired him or that he had any ill feelings toward the [petitioner] over the loss of the job. Welch also stated that he was not coached by the detectives regarding his conversations or meeting with the [petitioner]. He further related that the detectives never pressured him to call the [petitioner].

Circuit Court Judge Donna Fields testified that she represented the [petitioner] in contesting the divorce action filed by Ms. Britt. After the court set aside the December 2002 decree, the parties litigated the divorce for approximately six months. Judge Fields stated that Ms. Britt's actions indicated a consistent pattern of not allowing visitation. She stated that she had to intervene each time the [petitioner] sought to exercise visitation with his children. Judge Fields testified that the [petitioner] traveled to Memphis on February 28 to talk with her and that she told him that he would have to pay

between two and three thousand dollars toward his legal fees when they met.

Bartlett Police Department Officer Doug Bailey testified that the [petitioner] was the suspect in a criminal impersonation investigation in April 2002. He stated that Officer Phil Devers told him to check into the [petitioner] as a suspect. He was not aware that the [petitioner] and Officer Devers' wife were having an affair at the time. On cross-examination, he testified that Officer Devers had given him the [petitioner's] name because his vehicle matched the description of the vehicle given by the complainant. He stated that through his investigation he discovered that the [petitioner] did not match the physical description of the suspect, so he did not pursue the [petitioner] any further. He denied any knowledge of a conspiracy against the [petitioner] within the Bartlett Police Department.

Officer Phil Devers testified that he met the [petitioner] once when he introduced himself because "[the [petitioner]] was having an affair with [his] wife and [he] wanted him to know who her husband was." He acknowledged that he had spoken with Ms. Britt about their spouses' affair. He also acknowledged that he "despised" the [petitioner]. He related that he and his wife attempted to reconcile, that she told him the affair was over, but that several months later he learned that they were still seeing each other. He denied ever making threats against the [petitioner] to his wife. He recalled Welch telling him about the [petitioner's] desire to kill his wife and stated that his only involvement in the investigation was to tell his lieutenant who contacted Welch to initiate the investigation. On cross-examination, Officer Devers related that he gave the [petitioner's] name to Officer Bailey as a lead in the criminal impersonation investigation based upon information he received from a Shelby County Sheriff's Department deputy. When asked to explain what he meant by despising the [petitioner] he replied, "I loved my wife and I felt that he took her away from me." He also denied "setting up" the [petitioner] for the solicitation of murder or criminal impersonation cases.

Kim Devers testified that she had an affair with the [petitioner] from August 2001 until December 2001. She stated that her husband despised the [petitioner] and would become very angry at the mention of his name. She claimed that her brother, Welch, disliked the [petitioner] because of their affair. On cross-examination, Devers admitted that she and the [petitioner] resumed their affair in late 2002. She denied that she stole the RV from Ms. Britt's residence, claiming that it belonged to the [petitioner] because the court had dismissed the divorce decree and the RV was in the [petitioner's] name. She

conceded that she did not seek Ms. Britt's permission to take the RV from the residence. She also acknowledged that her husband never threatened to harm the [petitioner].

Phillip Ginn of First Tennessee Bank testified that the [petitioner] had access to a home equity line of credit in February 2003, but that no withdrawals were made on the account during that time period.

The [petitioner] testified that his telephone calls to Welch in late February related to Welch retrieving his truck from a Memphis body shop and driving the truck to North Carolina for him. He claimed that he and his ex-wife were trying to resolve the divorce in an amicable manner when she called him in tears on December 11, 2002 to tell him that she had gone ahead with the divorce. He stated that he retained Judge Fields to represent him in setting aside the decree and the subsequent litigation. He explained that he took the RV in January because he and his wife discussed him living in the RV until the property was divided. He learned that his ex-wife had reported the RV stolen while on his way to meet Welch with the RV. He stated that he called the Bartlett Police Department and explained to them that he had the RV and could not understand why it had been reported stolen. He claimed that the RV incident began the animosity between himself and his ex-wife. He related that visitation difficulties soon followed. He returned to Memphis in late February for one of his children's birthdays and to see his attorney. His attorney had advised him to bring an additional three thousand dollars for legal fees to their meeting. He recalled his conversations with Welch and characterized his statements as jokes and stated that he never intended to have his wife killed. He further stated that he never believed that Welch could hire a hit man. He explained the statement to Welch about killing his ex-mother-in-law as "just venting" because he was angry over problems regarding the birthday party. He stated that he never planned on giving Welch any money and that the money was for his divorce attorney.

On cross-examination, the [petitioner] admitted that, except for a reference to meet at the body shop, none of the taped telephone conversations between himself and Welch contain any discussions of a plan for Welch to pick up his truck and drive it to Knoxville for him. He claimed that the plan was understood by that point due to previous unrecorded conversations. He claimed that his ex-wife would not accept his phone calls on the night he took the RV and that he did not leave her a message because "I wanted her to talk to me." The [petitioner] also admitted that he had initiated conversations with Welch

about killing his ex-wife and her mother but insisted that he was only joking about it. He acknowledged that he continued to talk to Welch about "doing a double" because he was angry at his wife about various incidents but stressed that he was "just venting based on the circumstances." He also acknowledged discussions with Welch that he did not want his ex-wife killed at the kid's home and that she and her mother were together a lot and "[t]hat's what makes it nice." The [petitioner] admitted that he told Welch that he only had two thousand dollars on him but that Welch could follow him to the bank. He admitted to telling Welch that there "ain't no room for error in this motherf***er." He recalled going to First Tennessee Bank but not getting any money. In summary, the [petitioner] did not deny making any of the incriminating statements found on the tapes, but he insisted that he never intended to harm the victims.

*State v. John Britt*, No. W2006-01210-CCA-R3-CD (Tenn. Crim. App., at Jackson, Dec. 12, 2007).

Based upon these actions, a Shelby County grand jury indicted the petitioner for two counts of solicitation to commit first degree murder. Following a jury trial, the petitioner was convicted as charged and sentenced to consecutive ten-year terms. The petitioner appealed, and a panel of this court affirmed the convictions but modified the petitioner's sentences to eight years each. *Id*.

The petitioner thereafter filed a timely *pro se* petition for post-conviction relief, asserting that he was denied his right to the effective assistance of counsel. Following the appointment of counsel, an amended petition was filed. An evidentiary hearing was held at which only the petitioner and trial counsel testified. Trial counsel testified that she was appointed to represent the petitioner and that she met with him and discussed the case on at least fifteen occasions in preparation for trial. During their first meeting, the petitioner informed trial counsel "that he was innocent, that he was venting, that he was in a very bitter divorce. He [did not] mean any harm to his wife or his mother-in-law." Afterward, trial counsel and the petitioner:

. . . discussed that his defense would be - - and he agreed this is what he wanted. This was a horrible messy divorce he was going through; that Bartlett was after him because he had an affair with the Bartlett police officer's wife. And that this was all just venting, just no truth to anything he said. He was just saying these things out of anger and frustration and just it being a messy, messy divorce. He was venting to Mr. Welch, someone he trusted.

Trial counsel acknowledged that she had filed a notice of entrapment defense because the petitioner initially wanted to pursue this defense. However, she believed that the defense was not really viable for three reasons: (1) the State had recorded telephone conversations between the petitioner and Welch in which the petitioner demonstrated he was the "instigator" of the proposed conduct; (2) it would "have been very hard to prove that [the petitioner] was not predisposed to commit the crime[s] when all of the initial conversations were [the petitioner] contacting [Welch]"; and (3) the trial court had ruled that in order to utilize the defense, the petitioner would have to admit that he actually wanted his wife and mother-in-law dead, a position contrary to the petitioner's assertions. The only event which actually supported the entrapment defense was the one occasion on which the petitioner told Welch he would call him back but failed to do so, and Welch reinitiated contact. However, trial counsel stated that entrapment was, in reality, never a viable defense because the petitioner "was never going to admit" that he meant the things he said during the recorded telephone conversations.

Nonetheless, trial counsel testified that she did pursue a strategy at trial of trying to show that the Bartlett Police Department was "out to get" the petitioner because of his extramarital affair. She testified that she attempted to demonstrate the specific bias of Officer Devers through his testimony, as well as that of his wife. Trial counsel stated:

> . . . I got better on getting bias out when I put on [Officer Dever's] wife. I asked him about targeting [the petitioner] on some other investigations involving a criminal impersonation, again, through the Bartlett Police Department; asked him if he was angry with [the petitioner]; did he make threats about trying to get [the petitioner], which [Officer Devers] denied on the stand. But his wife said he did. That he would see [the petitioner] on TV and that he would state to the TV, "Oh, there's your boy. I'm going to get - - I'm not through with him yet. I'm going to get him."

Trial counsel stated that she also called Detective Doug Bailey to testify that it was Officer Devers who had suggested that the petitioner might be a person to investigate in a criminal impersonation case Bailey was handling. Trial counsel reiterated that, despite the fact that the entrapment defense was not viable and could not be used based upon the petitioner's own testimony, she attempted, nonetheless, to present the possible bias to the jury as best she could.

The petitioner also testified and stated that he had a "good working relationship" with trial counsel and that he had multiple meetings with her prior to trial. The petitioner stated that he was under the impression that the strategy at trial was going to be a two-pronged approach, that he did not commit the crime but, if he did, he was entrapped or induced to do

so. He further testified that, during *voir dire*, the jury was questioned upon both these defenses. However, after *voir dire*, the petitioner felt like the entrapment defense was totally abandoned when the trial court informed the defense that the petitioner would have to "admit guilt" in order to utilize the defense. The petitioner stated that this "caught [him] off guard" and that, when trial counsel asked what he wanted to do, he "had 30 seconds sitting at that table to make a decision. . . ." He related that he understood what was going on, but "he didn't have time to comprehend it." In a colloquy with the post-conviction court, the petitioner stated that, at the time, he understood that he had to "admit guilt" to the crime in order to use the entrapment defense. He acknowledged that he now understands, and that trial counsel actually said, that he had to admit he was serious about wanting to murder his wife and mother-in-law. However, when questioned further by the post-conviction court, the petitioner still stated that he would have testified on the stand that he did not really mean to have anyone killed.

The petitioner acknowledged that trial counsel had questioned witnesses in order to show bias on the part of the police department. However, he contends that a great deal of evidence in their possession was left out. He stated that the jury was questioned in *voir dire* and "prepped to hear [the] entrapment defense" and that he felt "sure [the jury] w[as] as disappointed as [he] was" "when we presented our limited [entrapment] defense."

After hearing the proof presented, the post-conviction court, by written order, denied relief. The petitioner now appeals that denial.

**Analysis**

On appeal, the petitioner has raised only the issue of ineffective assistance of counsel. Specifically, the petitioner asserts that his trial counsel was ineffective for failing to pursue an entrapment defense more vigorously at trial. To prevail on a claim of ineffective assistance of counsel, the petitioner bears the burden of establishing, by clear and convincing evidence, the allegations set forth in his petition. T.C.A. § 40-30-110(f) (2006). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient performance by trial counsel and (2) prejudice resulting from the deficiency. To establish deficient performance, the petitioner must demonstrate that his trial counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). While doing so, "the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Dellinger v. State,* 279 S.W.3d 282, 295 (Tenn. 2009) (quoting *Thompson v. State*, 958 S.W.2d 156, 162 (Tenn. Crim. App. 1997)). Instead, trial counsel's tactical decisions and trial strategy are afforded deference, provided that counsel's "choices are informed ones based

upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694). A reviewing court may elect to address deficiency or prejudice in any order and may opt not to address both if the petitioner makes an insufficient showing on either prong of the *Strickland* test. *Strickland*, 466 U.S. at 697.

Issues of deficient performance by trial counsel and any resulting prejudice to the defense are mixed questions of law and fact. *Burns*, 6 S.W.3d at 461. "[A] trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). However, conclusions of law are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id*.

Again, the petitioner's sole contention of ineffective assistance is based upon his trial counsel's failure to pursue the entrapment defense more zealously. He asserts that "[n]one of the government's witnesses were cross-examined on it, and it was not included in the jury instructions." He correctly notes that the general defense of entrapment, which states that it is a defense to prosecution that law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so, need only be fairly raised by the proof to be submitted to the jury. T.C.A. § 39-11-505 (2006). He contends that, had trial counsel utilized all the available evidence and done a more thorough job of cross-examining the witnesses, the proof would have, in fact, raised the defense.

To support his contention, he relies upon the direct testimony of Mr. Welch that: (1) Mr. Welch thought the petitioner was initially joking; (2) after the first call was made, the matter was not discussed again for six days; (3) the day the petitioner said he wanted the murders committed came and went without anything occurring; and (4) the petitioner did not meet in person with Mr. Welch or give him further instructions and made no efforts to obtain money to give to Mr. Welch. According to the petitioner, these facts show that he was "unwilling and not predisposed to commit the act." He also argues that inducement was shown by the Bartlett police force's act of directing Mr. Welch to reinitiate contact with him at a certain point. The petitioner asserts that "[c]ounsel's failure to use the entrapment defense, through cross-examination of witnesses Leatherwood and Welch, and to request any

-10-

jury instructions on the issue, deprived [the petitioner] of a viable defense and altered the outcome of the trial."

In its extensive order denying relief in this case, the post-conviction court noted that the petitioner limited his argument to the claim that trial counsel provided ineffective assistance of counsel by failing to more thoroughly cross-examine the State's witnesses in order to bring out the issue of entrapment. The post-conviction court opined:

> . . . The [p]etitioner testified that he wanted questions asked of the witnesses that bore more directly on the issue of entrapment, but none of these witnesses testified in the evidentiary hearing so it is difficult, if not impossible, to determine what those witnesses would have said on cross-examination.
>
> In this case [trial counsel] considered and prepared for an entrapment defense, but it was rejected by the trial judge. Furthermore, despite the judge's ruling she attempted to bring out the possibility of entrapment on cross-examination of some of the witnesses, even though [the p]etitioner was maintaining that he was not serious and had, thus, not been entrapped. Considering the dilemma [trial counsel] was facing[,] this court finds her action to be reasonable. More importantly [the p]etitioner has failed to show that [trial counsel's] performance fell below the range of competence demanded of attorneys in criminal cases. Likewise, [the p]etitioner has failed to show any "prejudice" as a result of any of [trial counsel's] actions or inactions. The four taped statements[,] which demonstrated the solicitations[,] were damning to the [p]etitioner. Likewise his testimony that he was the initiator of the subject with Mr. Welch went directly to his predisposition to commit the crime. Finally, his assertions that he never meant his statements to be taken seriously negated any claim of entrapment.

Our review of the record reveals nothing that causes us to question the findings and legal conclusions made by the post-conviction court. The petitioner failed to show prejudice as required by *Strickland* and *Burns*; even had his trial counsel taken all of the steps that the petitioner now urges, we can discern from the record no reason to believe that the jury's verdict would have been different. The petitioner failed to call the witnesses at issue during the post-conviction hearing and never demonstrated what they would have testified to at trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that "[w]hen a petitioner contends that trial counsel failed to [properly cross-examine] witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing" or "the petitioner fails to establish [the *Strickland*] prejudice requirement"). The four taped inculpatory statements of the petitioner, combined with the other testimony adduced at

-11-

trial, apparently overwhelmed the petitioner's meager exculpatory evidence in the minds of the jury, and it does not appear to us to be reasonably probable that either additional cross-examination of the government's witnesses or a jury instruction on the entrapment defense would have altered this result. The petitioner's repeated act of initiating conversation on the subject of his desire to have another person murder his wife and her mother belies the lack of predisposition to commit the crime necessary for him to establish an entrapment defense as equally as it belies his defense that he was merely expressing frustration or engaging in jest.

We also agree with the post-conviction court that the performance of the petitioner's trial counsel was not deficient in any respect. The record reveals that the petitioner's trial counsel fully explored and prepared an entrapment defense prior to trial. Moreover, in her questioning of witnesses on the stand, she attempted to raise the specter of the petitioner's entrapment by a police force that was "out to get him." As the post-conviction court correctly noted, the petitioner, by his maintaining that he never seriously intended for anyone to commit murder, significantly undercut any possible argument of entrapment, which requires the defendant to actually "commit [the] unlawful act" in order to apply. *See* T.C.A. § 39-11-505. While it is not unknown for litigating parties to take inconsistent or even contradictory positions on issues during trial, it will be the rare case indeed in which an attorney's decision to avoid doing so in front of a jury will be considered legally deficient performance rather than a reasonable trial strategy within the meaning of *Dellinger*. *See* 279 S.W.3d at 295. A trial attorney's decision regarding whether or not it will, under a particular set of circumstances, truly advance a defendant's cause for the attorney to speak out of both sides of his or her mouth is a quintessentially tactical one, fully meriting deference from a reviewing court under *Cooper*. *See* 847 S.W.2d at 528.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE